Please support Mr. Sussman. I'm Sean McRae represent Rod Pelling. In this case, we have two issues, the issue of the motion to suppress and the issue of the exclusion of the defense expert. Does the court have a preference concerning the order of the issues? No, that's your option. All right, then let's deal with the motion to suppress first. And of course, my position is that the court rules and the defense favor on that we don't have to get to the second issue. It's true. It is our position that there were coercive circumstances which turned this encounter into one requiring objective suspicion. And Mr. Sussman correctly points out at page 26, footnote 12 of the government's brief, that the defense did not object to the court's alternative finding of reasonable suspicion on appeal. Let me make it clear I do so now. I should have put a sentence in there about that, but it is our position that even if this court believes that the defense the encounter was consensual, as Judge Aiken found, that then the remedy is to reverse remand it for further proceedings because the reasonable suspicion issue was not one raised, argued by the parties, nor brought up in evidence at the time of the hearing. So we should be entitled to an opportunity to explore that. Didn't you make a record on that? I mean, the record is replete with the report of the motel employees as to what prompted the sheriff to respond. The record is replete with that, Your Honor, but not in terms of what the officers found as specific and articulable facts for how far they intended or thought they were entitled to go. And it is our position. Could you just stop that argument? I just want to understand it. So you're saying that even though all these facts are here, don't we step back and look at those and determine whether there was a reasonable articulable suspicion based on the facts? Because what you're saying is, no, we need more testimony from the officers? Well, what I'm saying is that was not an issue that was raised by the prosecution as a justification for the search, calling it a search for that purpose, for the search. And therefore, the defense did not fully develop that in terms of cross-examination of the officers at the time of the hearing, nor argue it to the court. Help me understand what your argument would be. As I understand the state of the record, based on what the motel employees had seen, the sheriff's deputies were entitled to at least knock on the door and make an initial inquiry into what's going on. Your client steps out and confirms that everything that had been reported to the sheriff by the employees had, in fact, occurred and that it was his 12-year-old daughter who did it. Now, the district court found that that was sufficient to establish reasonable suspicion. So, what's your argument at that point? What more do you want to litigate on the question? The officers testified, in addition, that one of them saw N.P. when the defendant stepped out of the room, didn't notice anything unusual. They also testified that during the time they were questioning Mr. Pelling outside, that N.P. opened the door and came out and said, is everything okay? They have an opportunity to observe her, don't observe anything unusual. But they didn't have a chance to talk to her, to find out what was going on between her and the man she was with. Well, then, see, Judge, you're making my argument for me, is that's exactly what I... I don't see your argument. I submit that I'm entitled to go into in terms of the reasonable suspicion aspect because... But do they need that? In other words, let me just back up. Let's say you went, that it's consensual, he says yes to the questioning, and you say, okay, well, even if you get there, we need to revisit reasonable suspicion. Is that your argument? That's my argument. Okay, so now we're back in the trial court. What is the evidence you would elicit and what's the argument you would make? The evidence that I would elicit is more concerning the information that they got from the employees because they were not witnesses in the case. Although the defense did interview them and did have investigative reports about what they told the police officers. In addition, the argument that we would make would be that any concerns that the officers had dissipated at the time that they had this contact, at least on an objective standard, dissipated at the time that they had this contact with Mr. Pelling. It doesn't make sense to me because what happened, what potentially gave them suspicion to go in there and to talk with them wouldn't be dissipated by the fact that they see the daughter, even if the daughter says everything's okay, they're going to take the 12-year-old and say, no problem, we're going home. Because that's what happened was inside the closed doors with the daughter, with what they saw on the bed, with the touching and all that. I can't understand how the daughter or anybody else would change that calculus. Well, Judge McKeown, what they had when they went to the door was they had information from the employees that they believed that only one of the two beds had been slept in. That they had seen a Playboy magazine and some movies. That they had observed what they thought to be inappropriate behavior at the pool and that the daughter had essentially flashed the defendant on the balcony. And he admitted that the pool activity and the flashing had occurred. The daughter had acted inappropriately, I believe. In terms of the pool activity, he indicated that he was surprised that anyone would be concerned about that. In terms of the flashing... But that doesn't dissipate the reasonable suspicion. That's the problem I'm having. Well, I don't agree that there was reasonable suspicion. That's really the issue. And I guess that's what you're going to have to decide. But if there was reasonable suspicion, then it's my position, or if you believe that that is an issue that has to be dealt with. If we get to that point, then what I'm saying is in terms of confrontation and due process, Mr. Pelling should have an adequate amount of time and ability in the district court to flesh out that record. Because that was not an issue before us at the time of the hearing. Well, it's an issue in the sense that you're moving to suppress, correct? I'm moving to suppress the evidence, yes. Right, but that all flows from this whole chain of events. So I don't know why it wasn't an issue before. You say the government didn't raise it and it was the government's burden. No, it's your burden if you think that your client's Fourth Amendment rights have been violated to move for a suppression hearing, which you got... Yes. ...in order to meet your burden to show that there was a constitutional violation here. Well, my understanding is when it's a warrantless search and seizure, the burden is on the government. There may be shifting burdens with regard to the introduction of the evidence. But when... But it begins with why were the police there in the first place? I agree. And is your argument now that they had no reasonable suspicion to even justify knocking on the door? Yeah. Really? Really, yes. I certainly didn't get that from your brief. Well, reasonable suspicion was not an issue in my view. Ms. McCray, maybe we're just splitting hairs here, but if you're moving to suppress the statements that your client made and all of the incriminating evidence that was found in his motel room and all of the fruits of that evidence, which led to the warrant to the search of his Yamhill house and all the incriminating evidence that came from that, why doesn't that put all those issues in play? Because the defense raises those issues. The burden then shifts to the government to provide a justification for why the warrantless searches and seizures are justified under the Fourth Amendment. The district court held a hearing on that, and there was testimony from the sheriff's deputies and your client. True. Right? Right. As to everything that occurred on that occasion. So what more would you have? What questions would you have asked that you didn't ask? I would have asked more questions about the information that they received from the hotel employees and the context of those questions. I would have asked more concerning the officer's policies regarding welfare checks and regarding reasonable suspicion and their policies in the Deschutes County Sheriff's Office. But I thought you said you interviewed all those people before or after the suppression. No, we interviewed them before. We interviewed the hotel employees before. So you had all that information, but you, for whatever reason, just chose not to ask the questions. It was not an issue at the time of the hearing, Your Honor. Well, that's where you're losing me, because it seems to me if you're moving to suppress the evidence, it puts it all in issue. And at that point, if you knew that there was information out there that might undercut the officer's reasons for even being there, it was incumbent upon you to ask those questions on cross-examination. Why shouldn't we find that you simply waived that particular aspect of your Fourth Amendment claim? Because the government didn't raise reasonable suspicion as a justification. But the government put in the evidence that shows they had reasonable suspicion, and it was incumbent upon you to try and shake the quality of that evidence through cross-examination of the sheriff's deputies who testify. Let me just add this. I'm just going back to the briefs, and maybe that's why I'm surprised by the argument, because the argument you're making now I don't see in your briefs, and maybe I'm missing something. So I'm just a little surprised. It's fine to argue it here. I just don't see it in the briefs, so I'm a little surprised because it's going down a direction that didn't seem to be on the table. Precisely, Judge, because I didn't see this as an issue on the table, and it was only when I was looking at the briefs again this morning that I saw the footnote from the government's. Well, you might have raised it in your reply brief at least, which has problematic procedural issues. But even that might have given us and the government a little notice that now this is a key issue on appeal. Well, it's all right. I mean, that's why I'm going back to the briefs, because I thought maybe I missed something. No, you didn't miss anything. Okay, thank you. Because it is and remains our position that this matter can be decided for the defense on the initial contact, because that became a seizure in a way that a reasonable person would feel his liberty was restricted based on the coercion and the show of authority by the police officers. Relying on the five factors in Washington, the case that Judge Aiken cited, but as comparative, we believe that it put Mr. Pelling in a position where he was not at liberty to ignore the police and go about his business. The number of the police officers, it was two to one. Whether weapons were displayed, clearly they weren't taken out of the holsters, but they were displayed, which Washington talks about. The encounter in the public versus non-public setting, and it is our position that although the motel room, as Judge Aiken found, was plainly visible from the parking lot, it was still more like private premises. It was not like the middle of Nordstrom. It wasn't like downtown at high noon. It was late, 945 in the evening. It was dark. It was isolated. Could I? I don't want to shortcut this argument, but the second issue to me seemed a slightly harder issue and more nuanced issue having to do with the evidentiary question and the specific and general intent. If you get through all the what ifs, whether it's a general intent or specific intent crime, as I understood the district court in the end, the district court said, well, even if it was specific, this testimony wouldn't be enough to negate that. And I would appreciate hearing your argument on that determination. Let me boil it down to the simplest terms. The defendant's position was not a question of did he do it and he should be excused because of his mental circumstances. His defense was he didn't do it. In other words, we're looking to the photographs and then we're inferring back to what his mental state would be because the question becomes, were these photographs that showed sexually explicit conduct? Clearly, Mr. Pelling is the one who made the photographs. They were of his daughter. He used her to make the photographs. But the question becomes, were they sexually explicit conduct? In other words, were they lascivious display of genitals? And probably now, with the time to think about it, the testimony of Dr. Rosenbaum would be most valuable to the jury in terms of Mr. Pelling's compulsive behavior versus the hypersexual activity because he's got a fancy Nikon camera, a high-powered digital camera that I think Sergeant Seema talks about, which takes a bunch of frames per second. So he's doing compulsive things. He's taking many, many photographs of his daughter. The jury's entitled to look at that. The jury's entitled to look at the whole context. In other words, his purpose in making the photograph, the sheer numbers of photographs of her, both clothed and unclothed, her position in those photographs. For example, there was no touching of herself. There was nobody else in the location. She's posing in different locations. Does this argument predicated on this being a specific intent crime? I don't think it makes a difference, Your Honor. Okay, so now basically just to recap, your argument as to why this evidence would come in, what would it come in under? It obviously wouldn't come in under insanity or really diminished capacity. You say it's compulsive, and you want to just show that he's, like, wound up and things just happen, right? Well, under 12.2b, the specification is expert evidence on any other mental condition of the defendant bearing on the issue of guilt. So certainly it gets to his mental condition in the sense that it is expert testimony as to his state of mind. So it was appropriate to raise it under 12.2, and it was relevant. Mr. Pelling was entitled to introduce it to assist in his defense, and the Court was premature in excluding it, particularly when we didn't even have any information of the government's proposed prior bad acts. And you say whether it's specific or general intent crime doesn't matter on that score? Your Honor, my position is that it would be more appropriate if the Court were to find that 2251A were a specific intent crime because it seems that there should be action by a defendant in this sort of case in using someone to make photographs that is intentional, willful, deliberate, malicious, or premeditated, as Judge Aiken noted, citing Cain v. the United States. But even if it's not a general, I mean, it's not a specific intent crime, then the evidence is still relevant because whether Mr. Pelling did so knowingly, in other words, in terms of absence of mistake or accidents, taking a bunch of photographs without meaning to, not having lascivious display, then that's still relevant for the trier of fact. So that argument is that somehow his finger gets on the button of the camera and it just rolls. No, that he's taking photographs of his daughter, but she's moving around, she's changing positions, he just keeps shooting indiscriminately. And one of the things is what he did with those photographs, which is nothing, they remained on his camera. Some of them were on the computer, admittedly. You need a camera expert, not a psychiatrist, but in any event, why don't we hear from the government? No, but besides that, that's just like a common sense argument you can make to the jury. Why does that require expert testimony? It's not a specific intent crime. Because the fact of his use of bromocrypting and the impact that that had upon him is relevant for the jury to understand. The impact upon him doesn't matter. I'm sorry? The impact upon him doesn't matter. It does, Your Honor, because it goes to his state of mind and his compulsive behavior. His state of mind doesn't matter if it's a general intent crime. Well, it's not a strict liability crime, even if it's a general intent crime. I know, so you can just, you know, and those kinds of arguments are just common sense arguments to the jury. Like I know I'm taking photos. That's all you have to know. Well, you know, members of the jury, remember, this is a high-speed camera. It takes 1,000 pictures a second. How high do you expect the defendant to know, you know, what each pose is like? I mean, that's just common sense. It's not an expert. It's certainly not a mental expert. Maybe it's a photographic expert, but not a mental expert. Sure, but then we have to get back to whether the jury can infer from the photographs themselves that they are a lascivious exhibition of the genitals. Lassiviousness is just a matter of common interpretation. I think we have case law to this. It's not a matter for expert testimony. Then we disagree, Your Honor. With the case law? With the definition of lascivious. All right. Thank you. Okay. Thank you. Good morning, and may it please the Court. Gary Sussman appearing for the United States. Ms. McRae's argument about reasonable suspicion is easily disposed of. An argument raised for the first time at oral argument is waived. That is the law of this circuit. It is common sense, and that disposes of the whole reasonable suspicion argument. Another way to dispose of it is to say that it doesn't matter whether there is reasonable suspicion or not, because as the district court correctly found, this was an entirely consensual encounter. The defendant was not in custody at the motel room and, in fact, was not taken into custody until later when he was at the sheriff's office after he had been interviewed. The entire contact at the motel room was entirely consensual. If he was not in custody, if he was not detained, then reasonable suspicion is not an issue. And the district court did enter an alternative finding that even if it was not consensual, there was reasonable suspicion. Which was amply supported by the record in this case. Right. Okay. Your Honors, suppression of evidence is a drastic remedy. It's intended to deter unlawful police conduct. It is not intended as a gift or a windfall for a criminal defendant. And whereas here there was no unlawful police conduct, where they did nothing wrong, where they infringed on no rights of the defendant, there's simply nothing to deter. There's nothing to suppress. As the district court found, the encounter at the motel room with the sheriff's deputies was entirely consensual. And it was. The district court described the officer's conduct as textbook police procedure. And it was. There was no display of force. There was no show of authority. Two officers knocked on the door and they waited for Mr. Pelling to answer. They didn't announce their presence. They didn't say, police, open the door. They just knocked and they waited. And when he didn't answer right away, they knocked again and waited again. Mr. Pelling came to the door. He was wearing only a towel around his waist. Apparently he had just gotten out of the shower. But after they identified themselves and said why they were there, he chose to step outside onto the balcony to talk to them. He wasn't ordered out. They didn't tell him to come out. They didn't even suggest that he come outside. He chose to do so and he pulled the door closed behind him. And he chose to remain outside on the balcony even after the officer said, would you feel more comfortable talking inside? And when his daughter came to the door and opened the door behind him and said, Daddy, is everything okay? He said, everything's fine. Go back inside. And instantly she, too, was wearing a T-shirt and a towel around her waist. Mr. Pelling still chose to remain outside with the deputies. He pulled the door closed behind him. He was standing with his back to the door. There was nothing between him and the door. He could have gone back inside any time he wanted to. There was no show of force. Nobody laid a hand on him. Nobody handcuffed him. Nobody told him he was under arrest. Nobody threatened him. Nobody threatened his daughter. There was none of that at any time. He voluntarily consented to letting the officers go in and search his room. He pushed the door open, stood out of the way, and said, go right ahead. Later, when he was back inside the room, he was given a written consent search form. Now, Mr. Pelling's a college-educated man. He read the form, both sides, front and back, and he signed it in the presence of both deputies. He specifically gave consent to search the images that were on the camera in addition to the original verbal consent and the subsequent written consent. Not only that, he turned the camera on, navigated to the playback screen, and turned the camera around and handed it to Sergeant Seema, playback screen side first, at which time he saw the naked image of the 12-year-old girl who was sitting in front of him in the motel room. He asked for consent to go through the images stored on the camera, which Mr. Pelling gave him. He said, it's art. That's all it is, just art. He voluntarily went with the deputies to the sheriff's office, and even though he wasn't under arrest, even though he wasn't in custody, he was advised of his Miranda rights on tape. The district court saw the advice of rights, found nothing wrong with the advice of rights, and incidentally in her briefs, Ms. McRae doesn't identify what it is she says was wrong with the advice of rights. And Mr. Pelling talked to the deputies for some two to three hours, during which he reaffirmed the fact that he'd gone down there voluntarily. There was simply nothing done. Oh, and by the way, when the deputies did take him down to the sheriff's office, they took nothing from his room at that point. Nothing. Even though he consented at least twice, once orally and once in writing, they left everything as it was in the room and went and got a search warrant, just as they got another search warrant for his residence. They did everything that they were supposed to do the way they were supposed to do it. They did it just the way we would want them to do it. There was no Fourth Amendment violation. There was no Fifth Amendment violation. There is no police conduct to deter. There is nothing to suppress. The district court correctly denied the motions to suppress the statements and the physical evidence. Turning now to the motion in limine. Mr. Pelling planned to testify about the medication that he was taking and the effect it had on him, his state of mind, and his intent. And he wanted to present expert testimony to talk about the potential side effects that this family of medications, these dopamine agonists, can cause in a small fraction of patients who are taking them. Now, it's important to note that this expert could not testify that Mr. Pelling was suffering from any of those side effects. He wasn't his treating physician. He had not examined him. He had never even met him before. However, the best that this expert can say was, this family of drugs can cause these sorts of side effects in a small fraction of people who take them. He couldn't say to any degree of reasonable medical certainty that it had happened to Mr. Pelling. The best he could do was say that it was a probability. But even if he were to say that, even if that's the best he could say, that changes nothing. First of all, none of these crimes in the indictment were specific offense, or specific intent offenses. Therefore, diminished capacity evidence is not admissible as a defense. You don't know that, do we, whether there were specific intent crimes or not? Well... There's no law on it in our circuit. Or in any circuit, for that matter. How can you make such a flat-out assertion? There's no law on it in any circuit. For one thing, there's no language in the statute that suggests that it's a specific intent crime. Oh, yes, it does. Knowingly possesses or knowingly accesses with intent to view. That's a different statute. And he wasn't charged under that prong of that statute. He was charged with knowing possession. And knowing is a general intent word. No, but it says knowing... But with intent to view, could be interpreted to modify possesses as well as accesses. Well, the point is there's no case law on it. Right? We don't know the answer. All right. Well, let's assume for a moment that... At least I don't know the answer. Obviously, you do. Well, I know that the Ninth Circuit has held that possession of child pornography, and this is the Santa Cruz case cited in our brief, has held that possession of child pornography, which is the section that you're quoting from, Judge, is a general intent crime and is not a specific intent crime. No court has held that production of child pornography is a specific intent crime. But let's set that aside for a minute, and let's assume, for the sake of argument, that you can call it a specific intent crime. Now, let's look at what this expert was prepared to testify to. It does not create a defense. It does not negate a single element of any of the crimes charged in the indictment. It was, as the district court correctly found, irrelevant. And more importantly, as you pointed out, Judge Tashima, it wouldn't have been helpful to the jury. What was the basis of the district court's ruling? Well, primarily that none of the offenses in the indictment were specific offense, specific intent offenses, and therefore the evidence was not admissible to present a defense in a general intent crime, primarily. And secondarily, that it wasn't relevant and that it would not have negated an element of the offense, specifically the purpose for which the images were created. Do we have to go figure out specific intent? Do we have to decide whether it's a specific intent or general intent crime? No, you don't. And here's why. You heard what Ms. McRae said she wanted that expert testimony for, to show that somehow the images were not lascivious exhibitions of his 12-year-old daughter's journals. I have to be candid. I'm not sure what the appellant's position is on that. Well, that's what I heard just a moment ago, and that's what I read in the briefing. That's what the assumption I'm operating on at this point. Okay? And that's what she said in her response to the government's motion in limine as well. That was the issue that she brought up. But really, whether particular images do or do not contain lascivious exhibitions of a 12-year-old girl's vagina is a question of fact for the jury to decide. This neurologist wasn't qualified to render an opinion on that. He's a neurologist. He can talk about drugs, but he can't talk about whether an image is or is not lascivious. And even if he could, it wouldn't be helpful to the jury. It's their province to decide that. That's their job, properly instructed on the factors. And when you look at those factors, not one of those factors, not one of them have anything to do with Mr. Pelling's intent or his state of mind. The first factor, whether the focal point of the image is on the child's genitalia or pubic area. Either it is or it isn't. And Mr. Pelling's state of mind has nothing to do with that at all. The second factor, whether the setting was sexually suggestive. Is it or isn't it? The jury can look at it and determine that for themselves. And Mr. Pelling's intent or state of mind has nothing to do with that determination. Third, whether a child is depicted in an unnatural pose or inappropriate attire, considering her age. Fourth, whether the child was clothed or nude. Either she was or she wasn't. Fifth, whether the image suggests sexual coyness or a willingness to engage in sexual activity. Again, Mr. Pelling's intent or his state of mind, whether he was hypersexualized by this medication, whether he had an impulse control disorder, none of that matters. And finally, whether the image was designed to elicit in the viewer a sexual response. And there again, the jury need only look at the images to decide that. Now, in his brief, Mr. Pelling suggests to you that the exclusion of his expert testimony somehow prevented him from raising his defense. And I see that's hogwash. Nothing prevented him from taking the stand and saying, I never intended to create child pornography and I didn't. This was art. These were artistic shots. These are not lascivious exhibitions. Well, you can't really have the evidentiary hearing decision hinged on his requirement that he takes the stand and denies this. He doesn't have to take the stand to do that. He'd have to take the stand. But he could if he chose to. But his attorney could argue that just as well. She could say, members of the jury, you have the images in front of you. Look at them. These are not lascivious exhibitions of the genitals or pubic area of any person. She doesn't need a neurologist talking about the potential side effects that could theoretically result from the use of this medication to have the jury make that determination. It's just beside the point. It's not helpful. It's not relevant. And it was properly excluded. Because that evidence neither formed a recognizable defense nor negated any single essential element of any of the offenses charged in the indictment, the evidence was irrelevant and inadmissible at trial. Now, that's not to say that it shouldn't be considered at any stage in the proceeding. It's really proper to be considered at sentencing, isn't it? Because it's talking about why Mr. Pelling did what he did, why he engaged in this kind of conduct. It's correct to be considered as mitigating evidence at a sentencing hearing. And that's where it was considered by the district court. That's the first time that this witness testified. He was at the sentencing hearing, and it came in without any objection from the government. The judge heard it. The judge considered it. The judge gave it the weight it was worth in imposing a sentence. But there's a big difference between what's proper mitigation evidence at sentencing and what's admissible testimony before the jury. And Ms. McRae told you toward the end of her argument that Mr. Pelling was that Rule 12.2B gave her that right. But 12.2B is a notice provision. That's all. It just says, look, if you want to bring this evidence in, you've got to give the government notice of it, which she did. But giving notice is one thing. The evidence still has to be admissible. And that it was not. The district court correctly concluded it was irrelevant, correctly concluded that it did not present a viable defense, correctly concluded that it did not properly excluded it. And that, members of the jury, was not an abuse of the jury. All right. All right. Nice speech, Mr. Pelling. Well, it's a good time for you to conclude. The bottom line is there was no error in this case, not in the denial of the motions to suppress and not in the exclusion of the evidence. And for that reason, your honors. And members of the jury. The judgment of the district court should be affirmed. Thank you very much. All right. We've used extra time on both of you. And we've heard the arguments from both of you. I appreciate the arguments from both counsel. The case of United States v. Pelling is submitted. The last case for argument today is United States v. Copp.
judges: Tashima, McKeown, Tallman